Argued at Pendleton October 29, affirmed and modified December 24, 1918. Argued on rehearing at Pendleton May 5, former opinion adhered to September 9, 1919.

## RUNNELLS *v.* LEFFEL.

### (176 Pac. 802.)

**Partnership—Duty of Partners—Good Faith.**

1. One partner owes a duty to the other partner of fair dealing, and this relationship continues even after the dissolution of the partnership, as to the items or contracts or assets remaining unsettled.

[As to agreement to share losses as essential to existence of partnership relation, see note in Ann. Cas. 1913B, 1335.]

**Partnership—Dissolution—Action for Accounting—Pleading—Fraud—Neglect.**

2. In suit against a former partner for an accounting, any fraud, neglect or misfeasance must be alleged in order to be available.

**Partnership—Contracts—Accounting—Dissolution.**

3. A contract with a partnership for the handling of real and personal property and the payment of commission for the sale thereof dies with the dissolution of the partnership, and where after dissolution one partner allows a contract of sale to be canceled, and a new contract is entered into whereby the seller transfers the property to a third person, another partner is not entitled to participate in a commission paid in connection with the second transfer.

**Costs—Equity.**

4. In a suit in equity for an accounting, the taxing of costs is a matter within the discretion of the trial court as between the accounting parties, but third persons made defendants for the sole purpose of attaching property in their hands should be allowed costs on dismissal of the complaint: Section 567, L. O. L.

### ON REHEARING.

**Partnership—Accounting—Fraud—Necessity of Pleading.**

5. In suit between partners for an accounting of commissions earned on a sale, which sale was not consummated by the buyer, but rescinded,

and the property resold to the buyer's wife, to be available as a ground of recovery, fraud, collusive or otherwise, in that such second sale to the wife was a subterfuge to prevent plaintiff from receiving his share of the commission earned on the original sale, must be pleaded.

BEAN, BENNETT and JOHNS, JJ., Dissenting.

From Wallowa: JOHN W. KNOWLES, Judge.

In Banc.

This is a suit for an accounting between A. M. Runnells, plaintiff, and W. E. Leffel, defendant. The other defendants are brought in the case for the purpose of attaching funds placed in their hands by the defendant, W. E. Leffel.

In 1915 and up to the latter part of the year 1916 plaintiff and defendant W. E. Leffel were partners in the real estate business under the firm name and style of Leffel & Runnells, each having an undivided one-half interest in the business. Some time shortly before the 1st of January, 1917, the partnership was dissolved. In the fall of 1915 the partnership had a contract with one C. B. Mays for the sale of twenty-four hundred (2400) acres of land near North Powder, Oregon, together with personal property used in connection with the same. In November, 1915, a sale was negotiated by said partnership of the farm and personal property of C. B. Mays to G. P. Higinbotham, the real property being sold for $45,000 and the personal property for several thousand, the exact amount not appearing in the evidence. At the time of making this sale Higinbotham paid $3,000 to Mays in cash, and within a few months made a further payment of $6,000. The partnership was to receive the sum of $6,000 commission, and $500 thereof was paid in cash and an allowance for expense, at the time of making the sale. At such time G. P. Higinbotham executed certain notes covering the balance of the purchase

price to C. B. Mays, and on December 11, 1915, $20,000 of said notes were placed in the hands of J. E. Lenhart of North Powder to hold and collect the same. At the time of such delivery a contract was entered into between the partnership and C. B. Mays, wherein said partnership was given, to secure the balance of their commission amounting to $5,500, an interest in said notes, and the agreement with the escrow-holder provided for the payment of their interest as the amount of the notes should be collected, and attached thereto was another memorandum stating in effect that the interest of said partnership in said notes would cease and determine in the event they were not paid. During the following year C. B. Mays had some difficulty with G. P. Higinbotham about the payment for the personal property sold, and in the fall of 1916 one of the notes due in connection with the contract of sale was not paid by G. P. Higinbotham, and from that date on until in July, 1917, efforts were made on the part of C. B. Mays to obtain payments on his contract, and ejectment proceedings against G. P. Higinbotham were threatened by C. B. Mays. In the purchase of this land from C. B. Mays, Maggie Higinbotham, the wife of G. P. Higinbotham, refused to join but continued to operate her own ranch near Echo, Oregon. On the sixth day of July, 1917, G. P. Higinbotham and C. B. Mays in the presence of the defendant W. E. Leffel canceled the contract of sale and purchase between Mays and Higinbotham, and the notes executed by G. P. Higinbotham were surrendered to him. On the same day C. B. Mays agreed to sell the real estate theretofore contracted to be sold to G. P. Higinbotham to his wife, Maggie Higinbotham, for $39,000, $17,000 to be paid in cash and the balance in notes. For making this sale W. E.

Leffel received $4,400 in cash and a note of Maggie
Higinbotham for $1,500 as commission. This sale
was consummated about the sixth day of August, 1917,
by the execution of a deed to Maggie Higinbotham of
the property of the Mays ranch. On August 31, 1917,
plaintiff filed his suit for an accounting, setting forth
therein the creation of the partnership between plain-
tiff and defendant Leffel, the sale of the Mays ranch
to Higinbotham, and the amount of commission earned
thereby by the partnership, the execution of the notes
by G. P. Higinbotham to C. B. Mays, and of the con-
tract between said partnership and Mays for an in-
terest in said notes to secure the payment of the com-
mission, and then makes the following allegations:

"That on or about the —— day of ——, 1917, at
the request of the said Higinbotham and said defend-
ant, W. E. Leffel, the said C. B. Mays and —— Mays,
his wife, conveyed said lands to Maggie Higinbotham;
and at all times herein mentioned the said Maggie
Higinbotham has been, and now is, the wife of the
said G. P. Higinbotham.

"That said lands were so conveyed to the said
Maggie Higinbotham under and by virtue of the terms
and conditions of said contract between the said Mays
and plaintiff and said defendant, W. E. Leffel, and
under and by virtue of the terms and conditions of
said contract between the said Mays and the said G. P.
Higinbotham.

"That at the time of said conveyance, on or about
said —— day of ——, 1917, the balance of said pur-
chase price was paid, with the exception of a part of
the interest accrued thereon.

"That on or about said —— day of ——, 1917, said
defendant, W. E. Leffel, collected and received from
the said Mays a certain sum (or certain sums) of
money in payment of the balance of said commission,
and so received and collected the same as the money
of plaintiff and said defendant and as belonging to

plaintiff and said defendant by reason of said sale of said lands and personal property as such partners; and the said Mays paid said certain sum (or certain sums) of money to said defendant, W. E. Leffel, as the balance of said commission. But plaintiff does not know what amount of money was so paid by the said Mays and collected and received by said defendant, W. E. Leffel.

"That said defendant, W. E. Leffel, has failed and neglected to account to or with plaintiff for said money so collected and received by said defendant."

The complaint further alleged the insolvency of Leffel and asked for a restraining order against the said defendants in regard to the funds in their possession, which, it was alleged, was the commission received on the sale to Maggie Higinbotham. The answer admits in effect the partnership that had existed between plaintiff and defendant W. E. Leffel, the sale of the C. B. Mays ranch to G. P. Higinbotham, and the commission earned thereby, the interest of the partnership in the notes given by Higinbotham, and then set forth that such interest in said notes would terminate in the event they were not paid, and that by reason of the failure of G. P. Higinbotham to carry out his contract of purchase, the contract had been canceled and surrendered up by G. P. Higinbotham, and the notes canceled and returned to him. That the partnership had no further interest in and to said notes or commission represented thereby, and set up as a counterclaim a request for an accounting of other partnership matters as against the plaintiff herein. A decree was entered dismissing the complaint and denying the relief sought by the defendant W. E. Leffel and dissolving the injunction and denying costs to either party. Plaintiff appeals generally, and

defendants file a cross-appeal on the ground that their costs should have been allowed to them.

AFFIRMED AND MODIFIED.

For appellant there was a brief and an oral argument by *Mr. A. S. Cooley.*

For respondent W. E. Leffel there was a brief over the names of *Messrs. Cochran & Eberhard* and *Mr. A. W. Schaupp,* with oral arguments by *Mr. Colon R. Eberhard* and *Mr. Schaupp.*

For respondents Alice Leffel, First National Bank of Joseph and First Bank of Joseph, as cross-appellants, there was a brief over the names of *Messrs. Cochran & Eberhard* and *Mr. A. W. Schaupp,* with oral arguments by *Mr. Colon R. Eberhard* and *Mr. Schaupp.*

OLSON, J.—This is a suit for an accounting as to moneys received by one partner after a dissolution of a partnership on contracts and notes made before the partnership was dissolved. The complaint alleges in substance that said commission had been earned by reason of the sale of real and personal property, and to secure this commission an interest in certain promissory notes executed by the purchaser of said property had been assigned to the partnership; that at the request of such purchaser and the defendant, W. E. Leffel, a deed to the property was made to the purchaser's wife, and that such conveyance was made under the terms and conditions of the original contract with the purchaser; that a commission was paid to the defendant W. E. Leffel, and that such commission was paid under and by virtue of the original con-

tract between the partnership and C. B. Mays, and by virtue of the agreements subsequently made, giving an interest in the notes given by the purchaser of the land.

1, 2. We have read all of the evidence carefully but fail to find such contention supported. The evidence shows that the original contract between C. B. Mays and G. P. Higinbotham was canceled and the notes surrendered and that a new contract was made with Maggie Higinbotham and consummated. The original contract with G. P. Higinbotham was for the sale of both real and personal property, the real property amounting to $45,000, and the personal property to several thousand dollars, the exact amount not appearing. The sale to Maggie Higinbotham was for the real property only, the consideration being $39,000. The original commission to be paid to the partnership was $6,000, of which $500 was paid at the time of making the contract of sale. The commission collected by W. E. Leffel was $5,900. There is evidence in the record upon which the lower court could have found that defendant W. E. Leffel conspired with C. B. Mays to cancel the old contract and have the property transferred to Maggie Higinbotham merely as a subterfuge in order to defraud his former partner out of his share of the commission, but nowhere in the complaint is there an allegation of fraud on the part of W. E. Leffel, nor of any conspiracy. There is evidence that would seem to show that W. E. Leffel did not take his former partner into his confidence as to the exact situation in regard to the Mays-Higinbotham deal, nor give his former partner an opportunity to protect himself in saving his share of the commission, but there are no allegations in the complaint as to these matters. The complaint seeks an accounting as

to the proceeds of a certain definite contract and the
notes securing the same. The evidence of the plain-
tiff clearly shows that these notes were not paid, and
that no proceeds were received under the terms of said
contract. It is true that one partner owes a duty to
the other of fair dealing, and that this relation-
ship continues even after the dissolution of a part-
nership as to the items or contracts or assets remain-
ing unsettled, but the relation of partnership does not
exist as to matters outside of the particular contracts,
assets or items so remaining. It is also true that one
partner cannot willfully dissipate the remaining unset-
tled assets and avoid liability for such accounts, but
in a complaint filed against him the fraud or neglect
or misfeasance complained of must be set out. It has
been held by this court that fraud must always be
alleged in order to be available: *Leavengood* v. *McGee,*
50 Or. 233 (91 Pac. 453). All of the evidence in re-
gard to the intention of defendant W. E. Leffel to de-
fraud his former partner by securing the cancellation
of the G. P. Higinbotham contract, by preventing a
loan being made upon the property which might have
prevented the cancellation of such contract, is clearly
not responsive to any allegation of the complaint.
The rule is clearly stated in *Eastman* v. *Jennings-Mc-
Rae Logging Co.*, 69 Or. 1, 7 (138 Pac. 216, 218, Ann.
Cas. 1916A, 185), as follows:

"Section 725, L. O. L., states the cardinal rule of
evidence in the following words: 'Evidence shall cor-
respond with the substance of the material allegations,
and be relevant to the questions in dispute.' Each
party shall prove his own affirmative allegations (Sec-
tion 726, L. O. L.) that are denied by the other party.
A plaintiff can recover only upon the allegations of
his complaint. *The* facts constituting his cause of ac-
tion must be stated in his complaint, and these allega-

tions he must prove, if they are denied. If he fails to prove any material allegation of his complaint that has been put in issue by an answer, he must lose.

"In *Union St. Ry. Co.* v. *First Nat. Bank,* 42 Or. 611 (72 Pac. 588), the rule is stated thus: 'It has often been held by this court that the plaintiff must prevail, if at all, upon the matters alleged in his complaint. * * ' "

3. Plaintiff contends strenuously that the moneys received from the sale of the property to Maggie Higinbotham, whether such deal was fraudulent or not, were nevertheless paid to W. E. Leffel under and by virtue of the old commission contract between A. M. Runnells and W. E. Leffel and C. B. Mays. This contention is untenable for the reason that a contract with a partnership for the handling of real and personal property and payment of commission for the sale thereof, dies with the dissolution of the partnership. It is not an assignable contract. It has served its purpose in the sale originally made to G. P. Higinbotham, and the rights to a commission as to that sale had already accrued. Such commission contract was not alive for the benefit of the partnership for any sale made to third parties after the dissolution of such partnership.

4. The defendants have filed a cross-appeal on the ground that costs should have been allowed them in the lower court. The taxing of costs in equity cases is a matter within the discretion of the trial court. In view of the fact that defendant W. E. Leffel came into court seeking affirmative relief by way of an accounting, we cannot see there was any abuse of discretion in the trial court in refusing him costs, but as to the other defendants who were brought into court without being concerned in the proceedings, other than being in pos-

session of moneys sought to be impounded, they are in a different position and should be allowed their costs.

Affirmed and modified as to costs.

                    AFFIRMED AND MODIFIED.

HARRIS, J., absent.

————————

·Former opinion adhered to on rehearing September 9, 1919.

ON REHEARING.

(183 Pac. 756.)

*Mr. A. S. Cooley,* for the petition.

*Messrs. Cochran & Eberhard* and *Mr. A. W. Schaupp, contra.*

In Banc.

BENSON, J.—For a general statement of the facts of this case reference is made to the former opinion of this court herein: *Runnells* v. *Leffel et al., ante,* p. 342 (176 Pac. 802).

The vital issue, as there disclosed by the complaint, and denied by the answer, is this: Was the conveyance to Mrs. Higinbotham, executed on August 6, 1917, made to her in consummation of the original contract between Mays and Mr. Higinbotham, and at the request of the latter and Leffel, or was it a new and independent deal? The evidence of all the parties who participated in the negotiations of July 7, 1917, tends to establish the following facts; that Mays and Leffel had, for some time been importuning Higinbotham to make some payment upon his overdue notes, and without success. On the morning of July 7th, Mays notified the delinquent vendee that he must either make a substantial payment or that ejectment

proceedings would immediately follow. Higinbotham replied that he was unable to make payment, and proposed to give up the executory contract and possession of the land, in exchange for his notes. Mays accepted this offer, and upon receiving the written contract from Higinbotham, returned to the latter his unpaid notes, and shortly thereafter, notified Leffel of what had occurred. Leffel then had a conversation with Higinbotham and his wife, in which she made a definite offer to buy the land herself for $39,000. This offer was accepted by Mays, and on August 7th, Mays and wife, Higinbotham and wife and Leffel met at the law office of Mr. Slater, in La Grande, at which time Mrs. Higinbotham paid Mays $17,000 in cash, and received a deed for the land in her own name, executing to Mays a mortgage in the sum of $22,000, for the remainder of the purchase price. She testifies, very positively, that her husband did not furnish a dollar of the money which she paid for the land and has no interest therein. She says that Mays and Leffel had importuned her frequently to help her husband in making payments under his contract, and that she had always refused to do so, and that her purchase of the property was entirely independent of any prior negotiations between her husband and Mays and Leffel.

The plaintiff does not undertake to meet this testimony with substantive evidence of any other character, but contends that since Mays always urged that his net price for the land was $39,000, and that he had received that amount, he must necessarily credit Mrs. Higinbotham with the $9,000 in payments which had been forfeited by her husband, and that her relationship to the former vendee, and the circumstances surrounding the transaction, indicate that the second sale, to the wife, was a deceitful subterfuge, perpe-

trated by the several parties thereto, in order to prevent the plaintiff from receiving his share of the commission earned by negotiating the original sale. If this contention be the correct one, then the conduct of Leffel, Mays, and the Higinbothams amounted to a collusive fraud; but the complaint does not plead fraud of any kind, and no rule of pleading is more firmly established than that to be available as a ground of recovery or defense, fraud must be pleaded.

It follows that we must adhere to our former opinion.                     FORMER OPINION APPROVED.

BEAN, J., Dissenting.—This is a suit for an accounting of the partnership transactions between A. M. Runnells, plaintiff, and W. E. Leffel, defendant, who were partners in the real estate business under the firm name of Leffel & Runnells, from September, 1915, to the last of December, 1916. Each had a one-half interest in the business. There was no written agreement of partnership.

Defendant states that the partnership arrangement was made by degrees. Mr. Runnells kept a law office during the time. As might well be expected, differences arose in regard to expenses, and after the dissolution there was a disagreement as to the division of commissions.

A rehearing has been granted in this case upon a question of fact. The former opinion appears in 176 Pacific Reporter, 802. Soon after the time of the partnership agreement the firm obtained a contract or option for the sale of 2,400 acres of land near North Powder, Oregon, for one C. B. Mays for the price of $39,000. All over that amount obtained for the land was for the benefit of Leffel & Runnells. About November, 1915, a sale of the land was negotiated by the

firm to G. P. Higinbotham, for $45,000, making a commission of $6,000 for Leffel & Runnells.   Three thousand dollars in cash was paid to Mays, and about the next March, a payment of $6,000 was made.   At the time of sale, $400 cash was paid Leffel & Runnells, and an allowance made to Mays for expenses of $100, making a payment of $500 on the commission.   A contract of sale from C. B. Mays to G. P. Higinbotham was executed, and also certain notes covering the balance of the purchase price.   The notes were dated November 1, 1915, bearing interest 8 per cent.   On the eleventh day of December of that year an agreement in writing was entered into between C. B. Mays and Leffel & Runnells for the delivery to J. E. Lenhart as the holder of the following portion of the notes: No. 1 for $5,000, due November 1, 1916.   No. 2 for $5,000 due November 1, 1917.   No. 3 for $10,000 due January 1, 1918.   The holder was to use due diligence in collecting the notes.   It was agreed between the parties that the money collected on these notes should be paid in the following manner: Note No. 1 for $5,000, due November 1, 1916, $4,000 with interest to be paid to Mays, and $1,000 with interest to be paid to Leffel & Runnells.   Note No. 2 for $5,000, due November 1, 1917, $4,000, with interest to be paid to Mays, and $1,000 with interest to Leffel & Runnells.   Note No. 3 for $10,000 due January 1, 1919.   Six thousand five hundred dollars with interest to be paid to Mays, and $3,500 with interest to Leffel & Runnells.   It was stipulated as follows:

"That the intent of this agreement is that the party of the first part (C. B. Mays) is the owner of $14,500 principal of the above notes, and that parties of the second part (Leffel & Runnells) are owners of $5,500 principal of the above notes."

Attached to the contract of December 11, 1915, was another memorandum signed by Leffel & Runnells and C. B. Mays and his wife to the effect that it was agreed on December 11, 1915, as regards the G. P. Higinbotham notes, "that should said C. B. Mays be compelled to take the ranch back in lieu of payment of the notes given by G. P. Higinbotham, that the interest of W. E. Leffel and A. M. Runnells in the notes in the above-mentioned agreement ceases." This agreement and the $20,000 in notes were delivered to Mr. Lenhart to hold pursuant to the contract. He so held the notes and the agreement until he left the state and turned them over to another to hold for the same purposes.

About the time of the sale of the ranch, Mr. Mays sold some livestock and other personal property to Mr. Higinbotham, amounting in value to seven or eight thousand dollars. The sale of the personal property is not involved in this suit except as it may have a bearing upon the transactions relating to the real estate. Leffel & Runnells were not interested in the sale of the personalty.

The matter drifted along until July, 1917, without any payment of principal or interest being made on the notes. Efforts were made by C. B. Mays and Leffel & Runnells to obtain a loan for Mr. Higinbotham in order to enable him to pay twenty or twenty-five thousand dollars of the notes. This was without success. An effort was also made to interest Maggie Higinbotham, wife of G. P. Higinbotham, to secure the money for her husband. She was the owner of a valuable ranch in Umatilla County. About June, 1917, Mr. Mays, after repeated requests made at different times, insisted that the interest should be

paid, and something paid on the principal. On July 7, 1917, apparently for the purpose of making some adjustment of the matter, Mr. Mays and his wife, and Mr. Higinbotham and his wife, together with Mr. Leffel met in the City of La Grande, Oregon. Mr. Mays pursuant to the consent of Mr. Leffel made on behalf of Leffel & Runnells, obtained the contract of December 11, 1915, and the $20,000 in notes and took them with him to this meeting at La Grande. Mr. Mays informed Mr. Higinbotham in effect that he must have a part of his money or he would eject him from the land. Mr. Higinbotham had prior to that time encouraged Mr. Mays to believe that he would obtain a portion of the money and make payment, and when the last demand was made by Mays, Higinbotham stated to Mays, as we understand his language, that if he did not make payment, he did not want any additional expenses made, and that he would deliver possession of the land. After this, largely through the instrumentality of Mr. Leffel, an agreement was made with the consent of Mr. Mays and Mr. Higinbotham that Mrs. Maggie Higinbotham should take the land and pay Mr. Mays $39,000. As Mr. Mays testifies, the other deal was entirely settled. Mr. Mays stated to Mr. Leffel when this adjustment was proposed, "that he must have $39,000 net for the land."

C. B. Mays, as a witness for plaintiff, relates the transaction at length. He states that—

"I talked with Mr. Higinbotham somewhere on the street concerning it, and he told me that his wife would not help him out on it, and asked me to give him a little more time, and talked on just like he always did, —started to lie to me about it, just the same as he always did, and I told him I had heard that kind of an harangue long enough, and there was only two

things to do,—to pay me or I would start ejectment proceedings.''

At that time, Mr. Mays informed Mr. Leffel of his conversation with Mr. Higinbotham. Mr. Leffel said he would go back to the hotel and have a talk with Mrs. Higinbotham, and see what he could do. Mr. Mays testified further:

"He [meaning Higinbotham] agreed right there to give me back the paper. * *

"He agreed to give me back the place. * * I agreed to take it back, because he didn't feel that he ought to go to any extra expense on it, and he didn't know that I ought. That is the amount of it. * * "

Mr. Mays further stated:

"Right there and then, we agreed to that kind of an arrangement, and he,—I think we walked,—I don't know whether we walked right on to Slater's office,— Well, he said there he was willing to turn the place back to me; that he could not do anything, and his wife wouldn't help him. So then,—well, it is possible Leffel was along then I don't remember just when we did talk about it, but he and I had talked about it, and he said he would go back to the hotel and have a talk with her, to see if she cared to do anything about it going through, and if not, he thought the best thing for me to do was to step in and get them off the place; they weren't doing anything any way. * *

"Yes, he [Leffel] told me, about dinnertime,—was about the time we had this talk, that the old lady absolutely refused to help the old gentleman, and I think then Leffel and I talked out the conversation he had with them at the ranch. I think that was then too. * *

"As well as I remember it was agreeable to Leffel for me to take these papers back,—take this ranch back, I mean and my contract and things with this land, and he went and had a talk with her and came back to me during the afternoon. I,—as I said a minute ago, I don't remember what he and I did then,

but I know I talked with Leffel right away after talking with Higinbotham. He came to me again and told me, and whether I went on up to the hotel with him or not, I can't remember, but we walked about while talking these different things, and he told me that there was absolutely no use trying to do anything further about it, and that he was perfectly willing for me to take the place back, and then later,—it seems to me later in the day,—I didn't see Leffel for quite awhile, and he talked with Mrs. Higinbotham, and he came back and talked to me afterwards,—if as I had taken the place back from Mr. Higinbotham, if I would consider selling it,—something to that effect, and I said, 'Yes, I would sell it to anybody, so I got thirty-nine thousand out of it' and a little later he came back and * * he says 'Your ranch is sold, for I will sell it to the old lady,'—something like that. I can't remember the exact conversation. * *

"Any way after Higinbotham gave me these papers, we went up to Slater's office. I stated it to him like I would to any other man,—if she wanted that ranch, let's get busy while she was in the notion. So we went up to this office, and Higinbotham gave me his papers, —he had a copy of this contract still, and I gave him the notes,—I think that's it,—I gave him the notes about that time."

To the question:

"State whether or not you had possession of the notes of G. P. Higinbotham at the time you got that fifteen hundred dollar check from Mrs. Higinbotham."

This witness answered:

"No, because we had fully decided and settled that part of it and then later,—some time a little later, we made an agreement there, and I think she paid me fifteen hundred dollars then, but I don't know for sure if she did right then, but she paid me the balance of it at the time the deed was made any way,—the fifteen thousand."

Mr. Mays states in effect that by arrangement
    with Mrs. Maggie Higinbotham he got
    even ................................. $1,500
And at the time of the execution of the deed,
    Aug. 6, 1917 ........................... 15,500
And the balance of the $39,000, in notes and
    the mortgage for........................ 22,000

      Total............................$39,000

The $1,500 note of Mrs. Higinbotham was, pursuant
to an understanding with Mr. Mays, given to W. E.
Leffel as for a loan to Mrs. Higinbotham. In addi-
tion to that Mr. Mays paid Mr. Leffel by check $4,400,
making with the amount of $400 theretofore paid to
Leffel & Runnells, $6,300, besides the $100 of expenses,
paid by Mays in settlement of the commission and in-
terest on the portion of the notes which Leffel & Run-
nells owned, and which were deposited with Lenhart,
as shown by the agreement of December 11, 1915.

Mr. Mays also testified as follows:

"Q. And after you turned the land over to Mr.
Higinbotham, or after Mr. Higinbotham went on the
land and took possession of it, did you again take the
land and use it yourself?

"A. Well, I took the land back, but I didn't use it.

"Q. What do you mean by taking it back, Mr. Mays?

"A. I mean that Mr. Higinbotham could not pay
for the land, and turned it over to me,—turned the
papers over to me. That is what I mean.

"Q. When?

"A. Well, some time in July.

"Q. Who was present?

"A. *That took place at Mr. Slater's office, the same
time I mentioned before when were in his office there
at that time.*

"Q. Mr. Higinbotham, Mrs. Higinbotham, Mr.
Leffel and Mr. Slater and yourself, you mean?

"A. And my wife."

Again he states thus:

"A. From the time Mr. Higinbotham took charge of the land, according to his contract, until the time that he turned the papers back to me, I didn't have possession of that place or conduct it.

"Q. But since he turned the papers back have you had possession?

"A. Well, I had possession of the papers. The man hadn't moved off and I hadn't moved on."

In regard to the Higinbotham notes, Mr. Mays stated:

"Q. In other words, Mr. Mays, I mean, did you at that time and shortly prior to that time, figure up the interest that had accrued on these notes, and know about what that interest was at that time?

"A. Yes, I knew at that time about what it should be.

"Q. Well, did you at the time you conveyed to Maggie Higinbotham receive more than the face of these notes?

"A. More than the face of these notes mentioned here?

"Q. Yes.

"A. Yes."

Upon being asked when title to the land actually passed from him, Mr. Mays stated that he never did give title to G. P. Higinbotham; that the title actually passed in the fore part of August, 1917, when his wife and himself and Mr. Leffel, Mr. Slater, Mrs. Maggie Higinbotham and G. P. Higinbotham were present.

"A. In J. D. Slater's office is where I did all of the talking. * *

"Q. At that time did you pay any commission for the selling of the property? * *

"A. I paid to Leffel the difference in what I asked for the farm and what he sold it for. * *

"Q. Now when was you asking that certain price for the land—1915 when the contract was made?

"A. I didn't ask any different price on the land at any time to different persons.

"Q. In 1915 what was the price you fixed on the land, or the property to be sold?

"A. Thirty-nine thousand. * *

"Q. And subsequent to that time and up to the time when you finally made a deed, conveying that property to someone else, did you ask any other or different price than the thirty-nine thousand?

"A. No."

Mays also states that he lost in the transaction as some of the cattle, which he had contracted to Higinbotham and the increase thereof, died. It appears that Mr. Mays did not make a close estimate of the interest on the Higinbotham notes.

As we figure, the principal and interest to August 6, 1917, amounts to $41,080. Adding the amount paid by Higinbotham, $9,000, makes a total of $50,080, the original price of the land $45,000 and interest.

Mr. Mays actually received of G. P. Higinbotham ................................... $9,000

Of Mrs. Maggie Higinbotham................. 39,000

    Total amount received................. $48,000

Amount of interest actually deducted in the final settlement ........................$2,080

Out of the total amount received by Mr. Mays he paid as commission at the time of the contract with G. P. Higinbotham........ $  400

Note of Mrs. Higinbotham..................... 1,500

Checks ..................................... 4,400

Total amount of commission including the expenses ................................. 100

    Makes ..........................$6,400

Taking the interest of Leffel & Runnells in the
$20,000 notes deposited with Lenhart, $5,500, adding
interest at 8 per cent to August 6, 1917, $776.12, makes
the total amount of the commission due on that date
$6,276.12.

The amount deducted on the interest of the notes
for the commission was $376.12.

It is sometimes said there is veracity in figures.
Taking these figures, they clearly show that Mrs. Higinbotham not only received the full benefit of the
$9,000 paid by her husband on the ranch, but did not
pay the full amount of the interest on the balance.
Mrs. Maggie Higinbotham was a witness for defendant. She fixes the time of making arrangements for
her taking over the ranch definitely as July 6, 1917.
She testified to the effect that she was requested by
Mr. Mays to assist her husband financially in the purchase of the ranch about a week before the time they
came to La Grande; that she told Mr. Mays that she
would not give a mortgage on her ranch at Echo, and
that at La Grande Mr. Leffel endeavored to get her
to assist her husband, and she refused; that Mr. Leffel
first suggested to her to buy the place on the 6th of
July, 1917; that she did not know of any final understanding between Mays and her husband as to what
was going to happen to her husband at that time. She
states that the transaction was in substance as follows:
"Mr. Mays said he would deed me the ranch if I would
give him $15,500 cash, and he would take my notes for
the balance;" that that was the way the deal went
through; that she gave him a note for $1,500 at the
time (this is the note to Leffel, as we understand) and
made a cash payment of $15,500, and gave a note and
mortgage for $22,000; that her husband had nothing
to do with the $15,500, but she thought that he signed

the note for $1,500; that the deal was made on the 6th day of July. "I had nothing to do with the old deal." She stated that she came to La Grande on the 6th of July for the reason that "Higinbotham was trying to make some settlement with Mays." At page 242 of the transcript, she states:

"Well, I understood that,—from Mr. Higinbotham, he wanted me to kind of help him out on the land."

Mrs. Higinbotham understood from Mr. Higinbotham that Mr. Leffel wanted her to come to La Grande on the proposition of making a settlement some way with Mr. Mays; that she never thought of buying the land until the sixth day of July; that the deed of the land was made to her on August 6, 1917; that there might have been something said about what Higinbotham had paid on the land, she did not recollect it; that the $1,500 note was given to W. E. Leffel; that it represented that she borrowed $1,500 from him, "He furnished it to Mays"; that her husband was present when Mr. Leffel suggested that she purchase the land; that it was sometime after dinner.

"Q. And did you then go to Mr. Slater's office and make a contract concerning your buying the land?

"A. After I talked it over with Mr. Higinbotham, I did."

Mrs. Higinbotham talked with her husband about the advisability of buying the land.

It is the contention of plaintiff, as made by his complaint, that at the request of Higinbotham and defendant W. E. Leffel, C. B. Mays and his wife conveyed the land to Maggie Higinbotham under and by virtue of the terms and conditions of the contract of December 11, 1915, between Mays and Leffel & Runnells.

The contention óf the defendant is that under the agreement of December 11, 1915, and the supplemental memorandum attached thereto, that Higinbotham failed to make payment and turned "the ranch back in lieu of payment of the notes given by G. P. Higinbotham," and therefore the interest of Leffel & Runnells in the notes had ceased, and that there was a separate and independent sale of the ranch made to Mrs. Maggie Higinbotham.

After a careful reading and consideration of all the testimony, we are firmly convinced there was only one price and one sale of the land in question. It was agreeably arranged between Mr. Higinbotham and his wife that she should take title to the land and make payment of the balance of the notes and interest given therefor, after a portion of the interest was "knocked off."

For the notes in question of G. P. Higinbotham,
      Mr. C. B. Mays received, note of Mrs.
      Maggie Higinbotham ................... $1,500
      Also signed by G. P. Higinbotham.
And cash of Mrs. Higinbotham.............. 15,500
And notes and mortgage of Mrs. Higinbotham. 22,000

                    Total................$39,000

Which was entirely satisfactory to Mr. Mays, and fully satisfied the G. P. Higinbotham notes. Out of this amount received, Mr. Mays paid Leffel on account of the interest of the firm of Leffel & Runnells, $5,900.

Plaintiff claims in his complaint, and it is supported by the testimony, that the conveyance of the lands by C. B. Mays and his wife to Mrs. Maggie Higinbotham on August 6, 1917, was made under and by virtue of the contract of December 11, 1915, between Mays and Leffel & Runnells, and in satisfaction of the notes

mentioned and described in that agreement, and pursuant to the terms of the contract of sale of the ranch between Mays and G. P. Higinbotham.

The original option or contract for the sale of the land between C. B. Mays and Leffel & Runnells had served its purpose. It had been carried out by Leffel & Runnells in negotiating the sale of the land to G. P. Higinbotham, and has no further force or effect. It should not be confounded with the contract of December 11, 1915, as to the ownership of the notes.

Mr. Mays states that he paid Leffel the difference in what he asked for the farm and what he sold it for. Mays states that his price for the ranch, at all the times mentioned, was $39,000 net. Mrs. Higinbotham paid that sum. All agree to that. Then if this was what the land was sold for, Leffel was paid nothing. Mr. Leffel states that Mays' price for the land to Mrs. Higinbotham was $33,100, but we take Mr. Mays' statement in this regard. He appears to be a disinterested witness.

Mr. Mays is a man of business and understood the transaction. He plainly states that his price for the land was $39,000 net, and that he got what he asked; that he made only one price at any time during the transaction. It was impossible for him to make and receive a net price of $39,000 from Mrs. Higinbotham, when he only received from her $39,000, and out of that amount paid as commission $5,900 to Mr. Leffel. That would leave a net price of only $33,100. There are several earmarks in the transaction that show that the deal with Mrs. Higinbotham was an adjustment of the contract of December 11, 1915, and settlement of the original deal with G. P. Higinbotham. Mr. Leffel states in his testimony that when he mentioned the matter of negotiating with Mrs. Higinbotham, be-

fore Mr. Mays gave him an answer, he and his wife did some figuring; that he left them figuring and went away and got a cigar. When he returned Mays gave him the terms. Mr. Mays recognized his responsibility for the commission included in the notes deposited with Lenhart, and he only obtained the notes and contract from the holder, who was substituted for Lenhart, by the consent of Mr. Leffel, which could only have been made for Leffel & Runnells. Leffel & Runnells owned an interest in the $20,000 of notes deposited under the agreement to the amount of $5,500, with interest thereon at 8 per cent. This property right could not be obliterated or effaced by a mere juggle of words or turn of the hand. Giving one hundred per cent force to the memorandum attached to the agreement of December 11, 1915, between Leffel & Runnells and C. B. Mays and his wife, Mr. Mays was never "compelled to take the ranch back in lieu of payment of the notes given by G. P. Higinbotham." That contract in regard to the interest of Leffel & Runnells in the notes mentioned in the agreement should be given a fair construction as intended by the parties thereto, when the same was made. Such a construction would be that if the deal was not carried out, and Mr. Mays was compelled to cancel the contract of sale with Higinbotham, and take possession of the land, and never receive his payment of the notes, then he should not pay any more commission on the sale, and the interest of Leffel & Runnells in the notes should be canceled. Further, the contract was never intended to mean, and does not mean that Mr. Higinbotham did not have the right to sell and transfer his equity in the ranch to any third person. He had a perfect right to turn the place over to his wife and allow her to make the payment after a small reduction. It was not a

matter of concern to either Mr. Mays, Leffel or Run-
nells, to whom the title of the land was conveyed after
full satisfaction of the notes was made. It seems
strange that Mr. Leffel would claim that in 1917 he
made a new sale of the lands without any written
agreement as to his commission. He was an experi-
enced real estate dealer.

The contention arises from the fact that Mr. Leffel,
no doubt, attempted to make it appear that there was
an independent sale made to Mrs. Higinbotham. As
soon as G. P. Higinbotham indicated to Mr. Mays that
if he did not make settlement he would turn the ranch
back without expense, Mr. Leffel took it for granted
that this was actually done. The change in the deal
from Higinbotham to Mrs. Higinbotham was made
practically all in one transaction, and as we under-
stand Mr. Mays' testimony was all consummated in
J. D. Slater's law office. The money collected by Mr.
Leffel from Mr. Mays, August 6, 1917, was in satis-
faction of the commission earned by Leffel & Runnells
in the sale made to G. P. Higinbotham, and the defend-
ant Leffel should account to plaintiff Runnells for one
half thereof.

The statement of Mr. Leffel to Mr. Mays, when he
said he would go back to the hotel and have a talk with
Mrs. Higinbotham and if nothing could be done the
best thing for Mays to do was to get them off the
place, indicates that no definite action had then been
taken to restore Mays to the possession of the land.
Nothing was done in regard to taking the "land back"
after that until the matter was arranged for Mrs. Hig-
inbotham to take the farm and make the payment.
A high rate of interest was provided in the notes, and
it may well be that, as the place had run down some-
what, Mays would rather have the $17,000 and secured

notes for $22,000, than to insist upon all the interest being paid, and run the risk of being compelled to take the land. Leffel & Runnells before that had both indicated they would be glad to take about $2,000 each for their share in the notes, as the balance of their commission. Mr. Leffel did exceedingly well to collect $5,900.

It was understood in the partnership arrangement that Mr. Leffel should do the most of the work outside of the office in attempting to make real estate deals, and that Mr. Runnells should do the office business and assist in closing deals. Mr. Leffel was traveling a great deal during 1916. Made trips to North Powder, Walla Walla, Washington, and elsewhere, and incurred considerable expense.

The partnership trouble seems to have started on account of a purchase of a half interest in 320 acres of grazing land by Mr. Runnells at $5 per acre. The title was taken in Mrs. Runnells' name. Mr. Leffel was in Walla Walla at the time attending to real estate business. Mr. Runnells telephoned him that he could make the purchase, and that he thought it would be a good thing for them to have the land to trade. There is a dispute between them in regard to the matter. We think that Mr. Runnells led Mr. Leffel to believe that he would make the purchase for the benefit of the firm, and he should be held to his contract. It was a part of the partnership business. The land was sold in a short time for $8.25 per acre. Runnells should account to Leffel for one half of the profit, $520. It is in evidence that on account of this transaction Leffel said: "He would get even with Runnells." The dissolution of the bonds between the members of the firm was culminated about the time that Mr. Runnells refused to pay a share of Leffel's ex-

penses while away from home on firm business. The agreement between Leffel & Runnells was somewhat carelessly made, and subject to change. Mr. Runnells claims that he paid out as much for expenses of the firm as Mr. Leffel did. The evidence does not bear this out. Leffel states the expenses to April, 1916, were settled. He itemizes his necessary firm expenses from April 4th to October, 1916, ranging from fifty cents to $84.50, and amounting in the aggregate to $489.10, which we find should equitably be shared by Runnells.

### STATEMENT OF PARTNERSHIP ACCOUNT.

| | |
|---|---:|
| Leffel collected of Mays | $5,900.00 |
| Runnells received on land deal | 520.00 |
| | |
| Total | $6,420.00 |
| First deducting expenses paid by Leffel | 489.10 |
| | |
| Leaves | $5,930.90 |
| To be divided equally, or each partner's share | $2,965.45 |

Leffel collected of Mays...................$5,900.00
Paid out expenses..............$489.10

| | |
|---|---:|
| Amount to be paid Runnells by Leffel | 2,445.45 |
| | |
| | $2,934.55 |
| Runnells retained profit on land deal | $ 520.00 |
| Amount to be paid Runnells by Leffel | 2,445.45 |
| | |
| Total amount to be received by Runnells | $2,965.45 |

Plaintiff is entitled to a decree against defendant for the sum of $2,445.45.

The sums of money belonging to defendant Leffel on deposit in the name of defendant's wife, Alice Leffel, should be subject to the satisfaction of this decree.

The decree of the lower court should be reversed and one ordered entered in the Circuit Court in accordance herewith. Neither party to recover costs in either court.

BENNETT and JOHNS, JJ., concur in the foregoing opinion.